75 A.3d 382

**CAS SEVERN, INC.**

v.

**Andrew AWALT.**

**No. 0431, Sept. Term, 2012.**

Court of Special Appeals of Maryland.

Sept. 6, 2013.

Jeffrey M. Schwaber (Deanna L. Peters, Judith G. Cornwell, Stein, Sperling, Bennett, DeJong, Driscoll PC, on the brief), Rockville, MD, for Appellant.

Joseph A. Compofelice, Jr. (Marcus Bonsib, LLC, on the brief), Greenbelt, MD, for Appellee.

Panel: MATRICCIANI, HOTTEN and CHARLES E. MOYLAN, JR. (Retired, Specially Assigned) JJ.

HOTTEN, J.

This appeal arises out of a breach of contract claim brought by appellant, CAS Severn, Inc. (hereinafter referred to as either "CAS" or "the company"), against the appellee, Andrew

Awalt ("Awalt"), for failure to abide by a professional service agreement's covenant not to compete.

As discussed in more detail *infra,* CAS contends that Awalt breached his contractual obligation by violating Section 9 of the Professional Service Agreement ("PSA"), prohibiting Awalt from soliciting the services of any employee or contractor of CAS for a period of one year following the termination of Awalt's business relationship with CAS. As a consequence, CAS filed a complaint against Awalt in the Circuit Court for Prince George's County and sought, among other things, a judgment in the amount of $313,999.50, attorney's fees, court costs, and a preliminary and permanent injunction prohibiting Awalt from further solicitation. After three months of discovery, the parties commenced trial on December 5, 2011.

On the last business day before trial, however, Awalt moved *in limine* and asked the court to find the liquidated damages clause of the contract void and unenforceable. Following argument of counsel, the court reserved its ruling on the matter, permitting trial to proceed. After a two-day jury trial and five hours of deliberations, the jury was unable to unanimously reach a verdict regarding whether Awalt had breached the terms of his agreement with CAS, and a mistrial was declared. Thereafter, the court entertained post-trial supplemental briefing on the validity of the liquidated damages clause. On February 6, 2012, the circuit court granted Awalt's motion by written order and declared the liquidated damages clause void and unenforceable because the provision was punitive and not compensatory in nature. Judgment was entered and the case was closed statistically.

Following the circuit court's denial of CAS's motion to reopen its case or, in the alternative, alter or amend judgment, CAS noted a timely appeal to this Court and has presented two questions for our review:

1. Did the [c]ircuit [c]ourt err in voiding the PSA's liquidated damages clause when its determination disregarded binding Maryland authority?

2. Did the [c]ircuit [c]ourt err in denying CAS a re-trial on the merits of its breach of contract claim?

For the reasons outlined below, we shall answer, "yes" to CAS's first question, reverse the judgment of the circuit court, and remand the case for further proceedings. Because we conclude that the court's judgment contravened settled precedent regarding the validity of liquidated damages provisions, we need not reach the other issue raised.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

CAS first became acquainted with Awalt as a result of its business relationship with Landrover of North America ("Landrover") in the late 1990's. At the time, Awalt was a computer engineer working for Landrover doing "everything an IT individual could do." As CAS began building its engineering department, CAS offered Awalt an employment opportunity in October of 2002. Thereafter, Awalt worked for CAS as a systems engineer, spending the majority of his time working with the company's customers to implement solutions to CAS's computer-based technological services.

After four years of employment with CAS, Awalt resigned as a full-time employee in October of 2006, but continued working as an independent contractor for the company. On November 1, 2006, Awalt entered into a four-page Professional Service Agreement ("PSA") with CAS, which governed his retention with the company. Pursuant to the PSA, Awalt agreed to provide technical services on a continuous basis until either of the parties terminated the PSA on fourteen days' notice. In addition, Section 9 of the PSA contained a covenant not to compete, and provided in pertinent part:

No solicitation. During the Term and for a period of one (1) year thereafter, Contractor [Awalt] agrees not to hire, solicit, nor attempt to solicit, the services of an employee or contractor of CAS nor shall the Contractor seek or accept employment from Client without the prior written consent

of CAS. Violation of this provision shall entitle CAS to assert liquidated damages against the Contractor equal to one hundred fifty (150) percent of the solicited person's annual compensation.

In 2007, Awalt began his employment as a sales engineer with Qwest Communications ("Qwest"),[1] a telecommunications provider of data and voice communications. During this time, however, Awalt continued his independent contractor relationship with CAS under the terms of the PSA. Following his first three years of employment with Qwest, Awalt was promoted to sales engineer manager in the spring of 2010. As an engineering manager, Awalt became "part of a process for on-boarding individuals." As a consequence, Awalt assumed the responsibility of hiring other sales engineers. Awalt was required to fill two sales engineer positions with individuals that would work directly under him at Qwest. Shortly thereafter, two of CAS's engineers, Jeff Jeglinski ("Jeglinski") and Mohammed Naji ("Naji"), were hired to fill these two positions at Qwest. Awalt had forwarded a job posting to Jeglinski in 2008 and sent additional employment postings to both Jeglinski and Naji.

Jeglinski had worked as a systems engineer for CAS since 2002. According to John Blanchette ("Mr. Blanchette"), Vice President of CAS's operations, Jeglinski was a "very bright engineer" able to handle almost any task assigned to him. Indeed, Jeglinski's skill set was highly sophisticated and there were "very few people . . . [who] were able to do some of the things he was doing." When Jeglinski submitted his letter of resignation to CAS on June 23, 2010, he was a senior engineer with an annual salary of $104,333. Unlike Jeglinski, Naji had been working as a waiter attending Capitol College when CAS hired him as a technician in 1997. CAS sponsored Naji's employment visa, provided him engineering opportunities, and trained him from "the ground up." As one of the company's

---

1. Awalt's trial testimony indicates that Century Link, headquartered in Monroe, Louisiana, subsequently purchased Qwest. The record, however, does not reflect when this occurred.

system engineers, Naji was rarely in the office, primarily spending his time addressing the concerns and needs of CAS' clientele. When Naji resigned from his employment with CAS in June 2010, he was earning an annual salary of $103,000.

Believing that Awalt had violated Section 9 of the PSA, CAS instituted a breach of contract claim against him on September 14, 2010 in the Circuit Court for Prince George's County, seeking, among other things, a judgment in the amount of $313,999.50, attorney's fees and court costs, and injunctive relief designed to prohibit Awalt from further solicitation.

CAS presented two witnesses at trial to explain the rationale behind Section 9's liquidated damages provision: Mr. Blanchette and Douglas Gerstmyer ("Mr. Gerstmyer"), one of CAS's founding members. During Mr. Blanchette's direct examination, he described the substantial money and effort CAS expended in order to replace one of the company's employees. Specifically, Mr. Blanchette noted that

> ... to bring an engineer into our line of work, to train [him or her] in how we do things and how our clients like to see it, certifications that we work closely with IBM and other vendors that we have to be certified in their product to sell or to maintain. Some of those trainings cost anywhere from [sic] between $3,000 and $5,000. The fees to, to hire from recruiter is anywhere between 15, 20, 25 percent, depending on the level of the person that we're trying to hire. **To bring the skill set up, to get them into the client, get the, the client to trust them the way they do people who have been with us for a while. You know that's, there's so many intangible pieces to it. The loss of productivity during the time the person is coming up. You know[,] it could be a little, it could be a lot[.] [I]t depends on the circumstance.**

(emphasis added).

In addition, Mr. Gerstmyer corroborated Mr. Blanchette's testimony regarding the difficulty in calculating CAS's incurred damages resulting from a breach of Section 9's covenant not to compete provision. He further attested to the

reasonableness of the one hundred fifty percent multiplier, indicating that he thought

> ... it [was] reflective of the significant cost [of] not only ... replacing the person, the recruiting fees, the initial training, getting some certifications, but it mainly is more reflective of the creation of the client relationships that happen over the course of years. And also, the significant loss of billings that the company suffers when a valuable person leaves the firm. Software and engineering companies like ours don't have any assets. The only thing we really have that is significant value is our, our employees. If we don't have employees, we don't have a company.

Mr. Gerstmyer further attested that when CAS lacks the ability to replace the specific skill sets of employees the company has lost, it does not have the "privilege of, of the revenue that those people earned."

At the close of CAS's case and at the close of evidence, Awalt moved for judgment on liability and renewed his motion *in limine* regarding the liquidated damages. Nonetheless, the circuit court denied those motions, stating, "... you know at this point, the inferences have to be in the favor of [CAS]." The circuit court subsequently reserved on Awalt's motion *in limine*. As a result, the case was submitted to the jury for deliberation. Unfortunately, the jury was unable to reach a unanimous verdict, resulting in the circuit court declaring a mistrial.

On December 20, 2011, CAS filed "[a] line requesting re-scheduling of trial which originally resulted in a mistrial." However, on February 6, 2012, the circuit court granted Awalt's motion *in limine*, declaring the liquidated damages clause void and unenforceable because CAS had failed to meet the burden of demonstrating actual damages. Curiously, the court additionally instructed the clerk to close the case statis-tically. Thereafter, CAS filed a post-trial motion to reopen the case or, in the alternative, pursuant to Maryland Rule 2–

534,[2] to alter or amend judgment, which the circuit court subsequently denied. As a result, CAS noted a timely appeal to this Court.

Additional facts shall be provided *infra* as they bear on the issues before this Court.

## II.

## STANDARD OF REVIEW

We observe that " '[w]hen reviewing a trial court's construction or interpretation of a written contract, we do so as a matter of law.' " *Willard Packaging Company, Inc. v. Javier ("Willard")*, 169 Md.App. 109, 120, 899 A.2d 940 (2006) (quoting *Nationwide Ins. Cos. v. Rhodes*, 127 Md.App. 231, 235, 732 A.2d 388 (1999).) " '[T]he determination of whether a particular clause in a contract is to be construed as providing for liquidated damages, or as a penalty, depends on the facts and circumstances in each case and is ordinarily a question of law for the court.' " *Id.* at 120–21, 899 A.2d 940 (quoting *Traylor v. Grafton*, 273 Md. 649, 667, 332 A.2d 651 (1975) (citing *H.J. McGrath Co. v. Wisner*, 189 Md. 260, 264, 55 A.2d 793 (1947))). Thus, the issue of whether a contract's liquidated damages provision is valid or a penalty is a question of law which we review *de novo*. *Barrie School v. Patch*, 401 Md. 497, 507, 933 A.2d 382 (2007) (citing *Bd. of Educ. v. Heister ("Heister")*, 392 Md. 140, 155, 896 A.2d 342 (2006), and

---

2.  Maryland Rule 2–534, entitled, "**Motion to alter or amend a judgment—Court decision[,]**" provides:

    In an action decided by the court, on motion of any party filed within ten days after entry of judgment, the court may open the judgment to receive additional evidence, may amend its findings or its statement of reasons for the decision, may set forth additional findings or reasons, may enter new findings or new reasons, may amend the judgment, or may enter a new judgment. A motion to alter or amend a judgment may be joined with a motion for new trial. A motion to alter or amendment a judgment filed after the announcement or signing by the trial court of a judgment but before entry of the judgment on the docket shall be treated as filed on the same day as, but after, the entry of the docket.
    (emphasis in original).

*Hammaker v. Schleigh,* 157 Md. 652, 667, 147 A. 790 (1929)).
It is through this lens that we address the arguments present-
ed before us.

## III.

## DISCUSSION

In support of CAS's first assignment of error, it contends
that "the liquidated damages clause of the PSA satisfies all
three requisite elements of a valid clause." CAS highlights
Awalt's concession to two of the three essential elements of a
valid clause, *see infra;* and, to that end, presents two argu-
ments demonstrating satisfaction of the remaining element to
the liquidated damages inquiry. Specifically, CAS argues that
the circuit court erroneously accepted Awalt's "no-actual-
harm" defense, "thereby essentially adding a fourth 'element'
to a valid liquidated damages clause that the amount be
supported by the non-breaching party's actual damages." In
addition, CAS avers that the circuit court additionally erred
"by shifting the burden of demonstrating actual damages
when, under Maryland law, the challenger of a liquidated
damages clause bears the burden of proving the unenforceabil-
ity of the clause." We agree with CAS.

It is well-settled that "[u]nder the principles of free-
dom of contract, parties have broad right to construct the
terms of the contracts they enter into as they wish, providing
the contract is neither illegal nor contrary to public policy."
*Willard,* 169 Md.App. at 122, 899 A.2d 940. Generally, "courts
will not inquire into any inherent disparity in the utility of a
given exchange between the parties, but solely into its volun-
tariness." *Id.* (citations omitted). As a consequence, the law
of compensatory damages applies to most actions brought in
contract and "provid[es] a standard measure of compensation
limited to the amount of injury incurred under a breach of
contract." *Id.* (citations omitted). In some instances, howev-
er, liquidated damages provisions "allow private parties to
reform that fixed concept of injury providing relief in excess,
or in lieu, of compensatory damages." *Id.*

In that regard, "[l]iquidated damages have been defined as a specific sum stipulated to and agreed upon by the parties at the time they entered into a contract, to be paid to compensate for injuries in the event of a breach of contract." *Barrie School,* 401 Md. at 507, 933 A.2d 382 (citing *Heister,* 392 Md. at 155, 896 A.2d 342). The fundamental purpose of liquidated damages is "to provide a reasonable measure of compensation in the event of a breach where, at the time the provision is agreed to the damages are indeterminable or will be otherwise difficult to prove." 24 WILLISTON ON CONTRACTS § 65:3, p. 250 (4th ed. 2002). Therefore, when a reviewing court is called to determine the validity of a liquidated damages provision, the court conducts "a more searching inquiry into the propriety and reasonableness of the agreement itself, under the auspices of the so-called penalty doctrine, than would be conducted in any more typical contract case." *Willard,* 169 Md.App. at 123, 899 A.2d 940 (footnote and citations omitted). A court must examine the reasonableness of the amount fixed as liquidated damages "from the standpoint of the parties at the time the contract was made." *Traylor v. Grafton,* 273 Md. 649, 663, 332 A.2d 651 (1975). Additionally, the court is required to determine the enforceability of a liquidated damages clause through an evaluation of three essential elements that ensure the clause's validity:

> ... "First, such a clause must provide 'in clear and unambiguous terms' for a 'certain sum'[.]" *Mass. Indem. & Life Ins., [v. Dresser ],* 269 Md. [364], 368, 306 A.2d [213] at 216 [ (1973) ] ( [c]itation omitted). "Secondly, the liquidated damages must reasonably be compensation for the damages anticipated by the breach[.]" *[Id.]* at 369, 306 A.2d at 216 ( [c]itations omitted). "Thirdly, liquidated damage clauses are by their nature mandatory binding agreements before the fact which may not be altered to correspond to actual damages determined after the fact[.]" *Id.* (citations omitted). While the language used by the parties is instructive in determining the validity of a liquidated damages clause **"[t]he decisive element is the intention of the parties— whether they intended that the sum be a penalty or an**

agreed-upon amount as damages in case of a breach and this is to be gleaned from the subject matter, the language of the contract and the circumstances surrounding its execution." *Traylor [v. Grafton ]*, 273 Md. [649], 661, 332 A.2d [651] at 660 [ (1975) ] ( [c]itations omitted). *Heister,* 392 Md. at 156, 896 A.2d 342 (emphasis added), *quoted in Barrie School,* 401 Md. at 509, 933 A.2d 382 (internal citations and quotations omitted in *Barrie* ).

In the instant case, neither party disputes that Section 9 of the PSA provides in "clear and unambiguous terms" a certain sum, nor do they aver that the clause may be altered to correspond with actual damages after the fact. Therefore, our analysis in the case at bar is limited to the second essential element of a valid liquidated damages clause: that "the liquidated damages must reasonably be compensation for the damages anticipated by the breach." *Barrie School,* 401 Md. at 509, 933 A.2d 382 (quoting *Heister,* 392 Md. at 156, 896 A.2d 342) (internal citations and punctuation omitted in *Barrie).*

Most recently, the Court of Appeals was called upon to consider the related issue of "whether a non-breaching party to a contract has a duty to mitigate damages where the contract between the parties contains a valid liquidated damages clause[,]" in *Barrie School v. Patch,* 401 Md. 497, 933 A.2d 382 (2007) (additionally concluding that the liquidated damages clause was valid and enforceable). There, a private, non-profit Montessori school entered into a re-enrollment agreement with the parents of one of the school's attendees (hereinafter collectively referred to as "the Patches"). *Id.* at 501, 933 A.2d 382. Pursuant to that agreement, if the parents of an attendee chose to withdraw their child from the school after a specified date, the parents would be required to pay the school tuition for the entire academic year as liquidated damages. *Id.* Specifically, Section 3 of the agreement provided:

I understand that unless the Student is withdrawn by written notice given by certified letter, return receipt requested, and received by the Head of School prior to May 31, 2004, I am liable for and agree to pay the entire year's

charges for the academic year, including expenses, as later defined, incurred by the School for collection. Withdrawal, dismissal, absences or illness of a Student during the year do not release me from any portion of this obligation. *Barrie School,* 401 Md. at 501–02, 933 A.2d 382 (quoting Section 3 of the re-enrollment agreement).

The Patches failed to cancel the agreement with the school prior to the May 31, 2004, deadline. *Id.* at 502, 933 A.2d 382. Indeed, the Patches did not provide notice to the school until forty-five days after the May 31, 2004 deadline, on July 14, 2004. *Id.* After the Patches refused to pay the remaining balance for their child's tuition and demanded reimbursement of the $1,000 non-refundable deposit, the school filed a breach of contract action against the Patches in the District Court of Maryland, sitting in Montgomery County. *Id.* The school sought the remaining tuition balance for the 2004–2005 academic year, plus twelve percent interest, and attorney's fees. *Id.* In response, the Patches filed a notice of intent to defend, stating, in part, that their agreement with the school was procured by fraud, that it was a contract of adhesion, that the liquidated damages constituted a penalty, and that the school was required to mitigate any and all damages prior to seeking recovery. *Id.*

The District Court found that "there was a valid contract between the parties, including a valid liquidated damages clause, that there was no fraud in the inducement to enter into the [a]greement, and that the [a]greement was not a contract of adhesion," and additionally dismissed the Patches counterclaim. *Id.* at 502–03, 933 A.2d 382. Nonetheless, the court ultimately concluded that the school's failure to mitigate its damages was fatal to its claim. *Id.* at 503, 933 A.2d 382. As a consequence, the District Court entered judgment in favor of the Patches against the school. *Id.* at 504, 933 A.2d 382. On appeal pursuant to Maryland Rules 7–101 and 7–102(b)(1),[3] the

---

**3.** Maryland Rule 7–101 *et seq.,* governs appeals to the circuit court from a judgment of the District Court of Maryland. Maryland Rule 7–102(b)(1), in pertinent part, provides:

Circuit Court for Montgomery County affirmed, stating as follows:

> The question is presented as to whether a party who is protected by a liquidated damages clause in a contract is excused of the normal contractual duty to mitigate its damages as a prerequisite to recovery. The court finds that such a duty does exist, notwithstanding the existence of a liquidated damages clause, and, thus, the District Court did not err as a matter of law in so finding. It is interesting to note that while no evidence of mitigation was presented, it would appear that mitigation had, in effect, already occurred when [t]he ... [s]chool already enrolled more students that its budget projections called for.

*Barrie School,* 401 Md. at 505, 933 A.2d 382 (quoting the circuit court's written memoranda). Both the school and the Patches filed petitions for *writ of certiorari* to the Court of Appeals, which were granted. *Id.*

In reaching its decision, the Court of Appeals preliminarily assessed the validity of a liquidated damages clause and observed that Maryland law explicitly recognizes that it is the challenger of a liquidated damages clause that bears the burden of proving the clause should not be enforced. 401 Md. at 507–08, 933 A.2d 382. Judge Irma S. Raker, writing for the Court, reasoned that

> [b]ecause [the defendant] seek[s] to set aside the bargained for contractual provision in the Agreement stipulating damages in the event of a breach, [the defendant] ha[s] the burden of proving that the clause should not be enforced. **Placing the burden of proof on the challenger is consistent with giving the non-breaching party the advantage inherent in stipulated damages clauses, that of eliminating the need to prove damages, and with the general**

---

(b) **On the record.** An appeal shall be heard on the record made in the District Court in the following cases:

(1) a civil action in which the amount in controversy exceeds $5,000 exclusive of interest, costs, and attorney's fees if attorney's fees are recoverable by law or contract[.]

Md. Rule 7–102(b)(1) (emphasis in original).

principle of Maryland law that assumes that bargains are enforceable and that the party asking the court to invalidate a bargain should demonstrate the justice of his or her view.

*Barrie School,* 401 Md. at 507–08, 933 A.2d 382 (citing *Dashiell v. Meeks,* 396 Md. 149, 167, 913 A.2d 10 (2006)) (emphasis added).

Thereafter, the Court observed that a liquidated damages clause may be deemed invalid as a penalty and unenforceable where the amount agreed upon is unreasonable and "grossly excessive and out of all proportion to the damages that might reasonably have been expected to result from such breach of the contract." *Id.* at 509, 933 A.2d 382 (quoting *Balto. Bridge Co. v. United Rys. & Electric Co.,* 125 Md. 208, 215, 93 A. 420 (1915)). In acknowledging that " 'one of the most difficult and perplexing inquiries encountered in the construction of written agreements' is determining whether a contractual clause should be regarded as valid and enforceable liquidated damages provision or as a penalty," *id.* at 510, 933 A.2d 382 (quoting *Willson v. M. & C.C. of Baltimore,* 83 Md. 203, 211, 34 A. 774 (1896)), the Court recognized that there are two primary requirements that must be met for Maryland courts to uphold the validity of a liquidated damages clause and not a penalty on grounds of reasonableness:

> ... First, the clause must provide a fair estimate of potential damages at the time the parties entered into the contract. Second, the damages must have been incapable of estimation, or very difficult to estimate, at the time of contracting.

*Id.* (internal citations omitted). Further, the Court explicitly cautioned that, as it had previously indicated, "in the absence of a statute providing otherwise,[4] **Maryland courts deter-**

---

4. For statutory provisions providing otherwise, *see, e.g.,* Md.Code (1975, 2002 Repl. Vol., 2012 Supp.), § 2–718(1) of the Commercial Law Article (providing that damages "may be liquidated in the agreement but only at an amount which is reasonable in the light of the anticipated or actual harm caused by the breach" in a contract for the sale of

mine the validity of a liquidated damages clause by looking to the stipulated loss at the time of the contract's formation, and not actual losses resulting from the breach." *Id.* at 510–11, 933 A.2d 382 (citing *Heister,* 392 Md. at 158, 896 A.2d 342) (emphasis added) (footnote omitted).

Consequently, the Court of Appeals concluded that the District and circuit courts correctly found that Section 3 of the Patches' agreement with the school was a valid liquidated damages clause and not a penalty. *Barrie School,* 401 Md. at 511, 933 A.2d 382. The Court reasoned that "[t]he sum [provided] in [Section] 3 was a reasonable forecast of just compensation for potential harm caused by a breach of the [a]greement. The damages contemplated in the [a]greement were neither grossly excessive nor out of all proportion to those which might have been expected at the time of contracting." *Barrie School,* 401 Md. at 511–12, 933 A.2d 382 (footnote and citations omitted). In addition, the Court further acknowledged, in that instance, the difficulty estimating the actual damages resulting from a party's breach at the time the agreement was entered. *Id.* at 512, 933 A.2d 382.

The Court subsequently addressed whether the school was required to mitigate any damages resulting from the Patches' breach and minimize its losses prior to seeking any monetary relief in contract. *Id.* Rejecting the Patches' argument that such mitigation was requisite and reversing the judgments of

---

goods). *See also* Md.Code (1975, 2005 Repl. Vol., 2012 Supp.) § 14–1106(c) of the Commercial Law Article (noting that under Maryland's laws governing layaway sales, the seller may "retain as liquidated damages an amount not to exceed 10 percent of the layaway price or the total amount paid by the buyer to the date of default, whichever is less"); Md.Code (1975, 2005 Repl. Vol., 2012 Supp.), § 22–804(a) of the Commercial Law Article (stating that under the Maryland Uniform Computer Information Act, damages for breach of contract may be liquidated by either party in an amount that is reasonable in light of anticipated loss, actual loss, or actual or anticipated difficulties of proving loss in the event of a breach); Md.Code (1974, 2013 Repl. Vol.), § 10–410(a)(1) of the Courts and Judicial Proceedings Article (providing that any person whose wire, oral, or electronic communications are used in violation of that subtitle is entitled to "[a]ctual damages but not less than liquidated damages computed at the rate of $100 a day for each day of violation or $1,000, whichever is higher[.]").

the courts below, the Court observed the *fundamental differ-ence* between liquidated damages and mitigation of damages. *Id.* at 513, 933 A.2d 382. Most notably, the Court observed that

> **one purpose of a liquidated damages provision is to obviate the need for the nonbreaching party to prove actual damages.** Thus, where the liquidated damages clause represents a reasonable attempt by the parties to agree in advance upon a sum that will compensate the nonbreacher for any harm caused by the breach, in lieu of the compensatory contract damage to which the nonbreach-er would otherwise be entitled, the clause will be upheld.

*Id.* at 513, 933 A.2d 382 (quoting 24 RICHARD A. LORD, WILLI-STON ON CONTRACTS § 65.1, at 230 (4th ed. 2002)) (internal quotations omitted in *Barrie Schools*) (emphasis added). See also 11 ARTHUR LINTON CORBIN, CORBIN ON CONTRACTS § 1062, at 307 (interim ed. 2002) (stating that a valid liquidation of damages makes other proof as to the amount of injury unnec-essary). Thus, once the court has completed its inquiry and determined that the liquidated damages clause is valid and enforceable, "it need not make further inquiries as to actual damages." *Barrie School,* 401 Md. at 513–14, 933 A.2d 382 (emphasis added). Therefore, there is no requirement to demonstrate an amount of actual damages to uphold a valid liquidated damages clause.

 In the case at bar, CAS presented testimony to satisfy the fundamental aspects of reasonableness, validating the liquidated damages clause. Indeed, Mr. Gerstmyer attest-ed that CAS incurs high costs from the loss of an employee, including the expense of recruiter fees and incalculable and unquantifiable injuries to business relationships with past and present customers. These damages were clearly incapable of estimation, or very difficult to measure, at the time CAS and Awalt entered into the PSA.

Regarding the expense of recruiters, Mr. Blanchette testi-fied that the recruiter fees ranged from fifteen to twenty-five percent of the replacement employee's salary. These are

monies expended in addition to the total salary paid to the replacement. In addition, he noted the significant time and expense it takes to educate the replacement, causing CAS to suffer from the loss of productivity and money during the period in which the replacement is acclimating to the company's policy, procedure, and assignments. In light of these potential expenses, the liquidation clause contained within Section 9 of the PSA provides a reasonable and fair estimate of potential damages at the time the parties entered into the contract.

Nonetheless, Awalt insists that CAS "blatantly misstates the law" and further contends that CAS bore the burden to demonstrate some discernable actual damages to validate the liquidated damages amount, relying primarily on this Court's opinion in *Willard Packaging Co., Inc. v. Javier,* 169 Md.App. 109, 899 A.2d 940 (2006). But our opinion in *Willard* predates the Court of Appeals' indisputable statement that it is the challenger's burden to prove that the liquidated damages provision is invalid and unenforceable. *See Barrie School, supra,* 401 Md. at 507–08, 933 A.2d 382. To be sure, this Court's opinion in *Willard* noted that, at that time, "no definitive Maryland Law [existed] on th[e] subject" of the parties' burdens of proof and production within an inquiry into the validity of a liquidated damages clause. 169 Md.App. at 127, 899 A.2d 940. Further, the facts of *Willard* are clearly inapposite to the case at bar. *Contra Id.* at 114–16, 899 A.2d 940 (noting that the non-breaching party had called all its employees to a meeting and mandated that the employees sign a covenant not to compete, prohibiting competing business within a seventy-mile radius, advised the employees that failure to sign would cause the employee's futures to "not be very bright," and providing a mere $50 in cash to justify consideration for the agreement).

There, this Court was confronted with parties that were neither on equal footing nor similarly situated. *Id.* Consequently, we narrowly held that

... a non-breaching party cannot simply survive the legal test of reasonableness, **regardless of the assignment of the**

**burden of proof,** where, as in [that case], the court is not dealing with a freely negotiated damages provision made between two parties of equal sophistication. Thus, the ultimate question of the assignment of the burden of proof, in cases where gross inequality of bargaining power exists, ought to be resolved in favor of the non-proponent of the provision, because the stipulated damage may prove unreasonable[.]

*Id.* at 130, 899 A.2d 940 (citing *Dist. Cablevision Ltd. P'ship v. Bassin,* 828 A.2d 714, 723–24 (D.C.2003)) (emphasis added). Further, we noted that no anticipated damages were ever taken into account in the employer's drafting of the covenant not to compete and that the employee did not possess "any particular skill or talent, which, if practiced for a competitor, would likely result in damage" to the employer. *Id.* at 134–35, 899 A.2d 940. As a result, we agreed with the trial court that the liquidated damages provision was unenforceable. *Id.* at 135–36, 899 A.2d 940.

But the facts presently before this Court are distinguishable from *Willard* in all material respects. No gross inequality of bargaining power existed between CAS and Awalt. There is no evidence that CAS advised Awalt that his future with CAS—as an independent contractor—would be jeopardized if he declined to execute the PSA. CAS neither asserted any undue influence nor produced nominal consideration to attain Awalt's manifest to be bound by the PSA. Further and as noted, *supra,* due to the particular skills and talents of CAS's engineers, the company seeks the help of recruiters for replacement employees and expends time and effort into training. Awalt was aware of the high degree of value that CAS's engineers maintained in supporting the productivity and success of CAS.

Finally, it was Awalt's burden to demonstrate that the liquidated damages clause within Section 9 of the PSA was unreasonable, invalid, and unenforceable. Awalt, however, failed to present evidence that the liquidated damages clause was unreasonable in any respect. Rather, he summarily argued that the provision was a *prima facie* penalty simply

because CAS did not introduce evidence of any actual damage, notwithstanding clear precedent acknowledging that no requirement exists. *See Barrie School,* 401 Md. at 513–14, 933 A.2d 382. Accordingly, we find the grant of Awalt's motion *in limine* clearly erroneous and reverse the judgment of the circuit court.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY IS REVERSED. CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEE.**